In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3768

JOHN F. VALINOTE,

*Plaintiff-Appellant,*

*v.*

STEPHEN R. BALLIS,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 00 C 3089—**Martin C. Ashman**, *Magistrate Judge.*

ARGUED MAY 20, 2002—DECIDED JUNE 26, 2002

Before EASTERBROOK, ROVNER, and EVANS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Omnibus Financial Group L.L.C. fell short of its founders' hopes. Formed by four investor-members in 1996, it was down to two (John Valinote and Stephen Ballis) by mid-1997, and in 1999 Valinote stopped participating in the firm's management. Early in 2000 Valinote decided to withdraw from the foundering concern and asked Ballis for an "exit strategy." This led Ballis to initiate the buy-sell clause of Omnibus's operating agreement. This procedure, common in closely held businesses, allows one investor to set a price on the shares (for an LLC, the membership interests); next the other investor decides whether to buy the first investor's

interest, or sell his own, at that price. The possibility that the person naming the price can be forced either to buy or to sell keeps the first mover honest.

Nothing in the operating agreement prescribes how investments are to be valued for this purpose. (A mechanical valuation for use in the event of a member's death or resignation does not apply to voluntary transactions among members.) Ballis named a price of -$1,581.29 for each 1% interest in Omnibus, implying a total of -$79,064.25 for the 50% stake that each of the two held. Valinote then decided to sell his interest to Ballis at that price—effectively paying Ballis $79,064.25 to take his 50% off his hands. At the time (surely this was no coincidence), Omnibus owed Valinote exactly that sum to repay a loan that Valinote had made to the firm. So the bottom line was that in March 2000 Valinote surrendered his interest to Ballis, who became the sole owner of Omnibus Financial Group. No money changed hands. Valinote could have acquired Ballis's interest on the same terms but must have thought that the real value was even lower than the negative price that Ballis had specified.

Later events confirmed the dim estimate of the venture's prospects. In December 2000 Omnibus defaulted on a $200,000 debt to a bank. The bank then collected on the guarantees of this debt that Valinote and Ballis had made. Valinote demanded that Ballis indemnify him for his $100,000 share and for any future payments that Valinote may be required to make. (Omnibus has at least one other bank loan of $400,000, though it may be secured by real estate.) Ballis refused, and the district court—acting through a magistrate judge on the parties' consent, see 28 U.S.C. §636(c), in this suit under the diversity jurisdiction, 28 U.S.C. §1332(a)(1)—held that Ballis is under no obligation to do so. 2001 U.S. Dist. LEXIS 15339 (N.D. Ill. Sept. 24, 2001). The magistrate judge concluded that the purchaser in a buy-sell transaction under Omnibus's operating agree-

ment acquires the seller's membership interest, and that any obligations of the seller to the firm are extinguished, see ¶10.C.2 (the buying member must "[a]ssume and become liable for all obligations of the selling Member to the Company"), but that obligations (such as guarantees) to third parties are unaffected. That's the implication of language dealing with obligations to the firm while omitting other obligations. Paragraph 9.J of the operating agreement requires members to indemnify each other for obligations under guarantees, but the court held that this refers to current members, not to former members such as Valinote.

The operating agreement offers some succor to former members: ¶9.E.1 requires indemnification of any "person" for liability reasonably incurred while that person was a member. That covers payment on a guarantee that enabled Omnibus to raise operating capital. But the indemnitor under ¶9.E.1 is "[t]he Company", which is to say Omnibus, and Omnibus is broke. Likewise Valinote's right to indemnity under the law of suretyship—by paying on the guarantee, Valinote stepped into the bank's shoes and acquired its $100,000 claim—is a right against Omnibus. What Valinote wants, however, is indemnity from Ballis, who unlike Omnibus remains solvent. That claim lacks support in ¶9.E.1 and the law of suretyship, and it runs up against the principle that corporate shareholders or LLC members are not liable for the venture's debts. That's the point of limited liability: people put at risk the amounts they invest (or contract for explicitly, as by guarantees) but not their full personal wealth. Omnibus's operating agreement makes this explicit: ¶9.D says that members "shall look solely to the assets of the Company for the return of their capital . . . [and] shall have no recourse against the Members, or any Member . . . except as specifically provided in this Agreement."

Valinote does not contend that anything in the operating agreement "specifically" requires indemnity from Ballis.

Instead he insists that it is so strongly implicit in the buy-sell procedure that it should be treated *as if* explicit. First, he observes, the buy-sell procedure allows a member to extricate himself from the company; that can't be done unless *all* financial entanglements are wrapped up. Otherwise a departing member remains at risk for things that have passed beyond his control; the firm might be sound at the time of withdrawal and be driven to ruin by the remaining members, triggering the guarantees. That uncompensated and uncontrollable risk should be eliminated by an indemnity requirement, Valinote insists. Second, Valinote contrasts the operation of the buy-sell procedure with the consequences of an outright resignation. Under ¶11.C a resigning member receives the mechanically computed value of each interest and "shall . . . forfeit all further interest in the Company, but shall not be relieved of or released from any personal guarantees or other personal covenants". No such provision appears in ¶10, which covers the buy-sell procedure; this implies to Valinote that sellers under ¶10 *are* relieved of guarantees. Why would he have sold to Ballis at a negative price under ¶10 when he could have resigned under ¶11 and demanded repayment of the $79,000 loan, unless the ¶10 procedure shifted the financial burden of the guarantees? Third comes the *coup de grâce*: because Omnibus was a *limited liability* company, membership interests cannot be worth less than zero. Shares of a bankrupt corporation trade for a positive price as a result of limited liability, for shares are worth at worst the scrap value of the paper, and the firm might recover. Yet Ballis valued each 1% interest in Omnibus at -$1,581.29. This must mean, Valinote insists, that Ballis was covering in advance the risk of indemnity on any guarantees. How else could the price go negative?

There is some force to these observations, but not enough to justify overriding the venerable principle of limited liability, which may be vital to a business's ability to raise

capital. Especially not when the operating agreement reinforces that principle by proscribing personal liability "except as specifically provided in this Agreement." The argument that "strongly implicit" is as good as "explicit" is equivalent to a plea that the *real* explicit language of the agreement—particularly the clause limiting personal liability—be overridden. That would make all contractual language unreliable, and such a step would not in the long run further the goals of investors such as Ballis and Valinote, who draft these complex agreements in the belief that what they have written will be enforced when push comes to shove. Although enforcement of the agreement may have costs—here it makes complete extrication more complex and exposes the withdrawing investor to risk if the unwinding is incomplete—these are not insuperable. Valinote could have negotiated with the bank to cancel his guarantee; the bank might have agreed, for a price, or Ballis might have agreed to assume the liability (again for a price). With so few people involved, the negotiations would not be especially costly. Far better for Valinote and Ballis to have resolved this issue between themselves *ex ante* than to ask a court to guess *ex post* what that deal would have looked like—especially when the process of guessing would override the parties' written agreement demanding specificity. (Paragraph 9.D also makes it inappropriate to turn to parol evidence about the negotiating history and the parties' expectations, which are even less certain than inferences based on the difference between ¶10 and ¶11.)

Nor is the negative price (or the contrast between buyout under ¶10.C.2 and resignation under ¶11.C) an enigma that can be understood only by assuming that Ballis had rolled into the price the risk of indemnifying Valinote. For the operating agreement did not strictly adhere to limited liability: there *is* a veil-piercing clause that appears "specifically" in the agreement. It is ¶9.J, which we now reproduce in full:

> The Company, or businesses and entities with
> which the Company may be associated, may from
> time to time be required to borrow funds and, to
> secure such loans, to deliver guarantees by one or
> more Members of repayment, performance, comple-
> tion, or other obligations of the Company or such
> associated venture. The Members covenant and
> agree that if any Member executes and delivers any
> such guarantee and if such guaranteeing Member
> incurs any cost or liability in connection therewith,
> then such cost shall be allocated among and shared
> by all of the Members in accordance with their re-
> spective Membership Interests.

In other words, if Member X makes good on a guarantee of
the company's indebtedness, then Member Y must pick up
part of the cost. This is a departure from limited liability.
It also shows how the value of interests could be negative;
each carries with it some risk of liability under ¶9.J. What
is more, when one member withdraws, prospective liability
under ¶9.J becomes concentrated on those who remain, be-
cause a *former* member is not exposed to liability under this
clause—except to the extent that ¶11.C provides that a
resigning member retains this liability. Thus the mysteries
are resolved. Ballis set a negative interest value because
Valinote's departure meant that he could no longer be
called on for indemnity under this clause, and Ballis's ex-
pected net outlay on his own guarantees increased accord-
ingly. Because exposure under ¶9.J could be substantial,
something like ¶11.C is essential to prevent members
from shucking their potential liability by resigning and
walking away; but when departure is negotiated under the
buy-sell provision, a price can be attached. Here the neg-
ative price compensated Ballis for giving up any oppor-
tunity to seek relief against Valinote under ¶9.J. (On our
reading of the operating agreement, Ballis received freedom
from future indemnity claims by Valinote; whether this was

worth enough to reduce the net effect to zero depends on the wealth of each investor, and hence the likelihood that a demand for indemnity would be honored. The record does not reveal this information. On Valinote's reading, Ballis gave up the right to indemnification while remaining liable on his own part; the risk that Valinote might prevail in this position would be enough by itself to generate a negative price.) And if Valinote feared that what he was giving up in return (the opportunity to recover from Ballis) was worth even more, perhaps because he anticipated that under Ballis's management the chance of a draw on the guarantees would increase, he had only to buy Ballis's stake at the price Ballis set rather than sell his own. Valinote's professed fear that as sole member Ballis could transfer all of Omnibus's assets to himself, leaving Valinote holding the bag, is groundless: Such a transfer would be a fraudulent conveyance, which Valinote, as Omnibus's creditor following a call on the guarantee, could rectify by reaching Ballis's assets. Valinote does not contend, however, that any fraudulent conveyance occurred, and he does not make a claim under the law of suretyship.

Valinote would like to turn ¶9.J around and use it as a source of recovery: he was a member when the guaranty was written, even though not when he made good that guarantee, and thus should be entitled to spread the cost among the other members (of which Ballis is the sole remaining example). But if we were to treat "member" in this language as including former members, how could Valinote gain? He would be entitled to call on Ballis to pick up a share—but Ballis would be entitled to call on Valinote for reimbursement too, and it would be a wash. Former members could not be "members" for purposes of collection while escaping that status for purposes of liability; the requirements are symmetric. (Recall that under ¶10.C.2 Ballis acquired Valinote's membership interest plus Valinote's obligations "to the Company," but not

Valinote's personal obligations to other members.) Like the district court, however, we think it best to read "member" to mean current member and exclude former member. This is the most natural reading; it avoids circular reimbursements; and it also avoids questions about what each person's responsibility is. Membership interests change, and Valinote's position would leave it up in the air what share each current (and former) member must pick up.

The district court read the operating agreement to mean what it says. Given ¶9.D, that was the most sensible course. By paying on his guarantee, Valinote was subrogated to the bank's rights and has a claim against Omnibus; and if Omnibus has a claim against Ballis, then Valinote can participate. But neither Valinote nor Ballis has a direct claim against the other; each must bear his own obligations under the guarantees. Ballis's motion for sanctions is denied, however; the appeal was not frivolous, and the operating agreement does not call for fee shifting in a dispute such as this.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-97-C-006—6-26-02